IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ------------------------------------------------------ : | |
| UNITED STATES OF AMERICA : | CASE NO.  1:06 CR 0057 |
|  : | |
| Plaintiff : | |
|  : | |
| -vs- : | MEMORANDUM OF OPINION AND |
|  : | ORDER DENYING DEFENDANT'S |
| JOSHUA SPAULDING : | MOTION TO SUPPRESS |
|  : | |
| Defendant : | |
| ------------------------------------------------------ : | |

UNITED STATES DISTRICT JUDGE LESLEY WELLS

Before the Court is defendant Joshua Spaulding's ("Mr. Spaulding") motion to suppress all evidence seized from his person and the vehicle he was operating at the time Officers Alan Jones ("Officer Jones") and Joseph Danzy ("Officer Danzy") of the Akron Police Department performed an investigative stop.   Mr. Spaulding also moves to suppress any admissions he made to the officers in the course of his arrest and custodial interrogation.  (Docket No. 26).  The government provided a brief in opposition.  (Docket No. 27).

At a suppression hearing on 20 July 2006, the Court heard argument from counsel and testimony from Officers Jones and Danzy, as well as from Officers Jerry Forney and Michael Gilbride regarding the events surrounding Mr. Spaulding's arrest. In requesting the hearing and motioning for the suppression of evidence, Mr. Spaulding avers the officers:

> (1) violated his constitutional rights by stopping his car without reasonable suspicion to do so; (2) obtained a search warrant for and executed a search of the home located at 949 Vernon Odum Boulevard, in Akron Ohio, without probable cause to do so; and (3) solicited incriminating statements from him without obtaining a valid waiver of his Miranda rights and without recording or otherwise memorializing those statements.

(Docket No. 26 p. 1). In response, the government maintains the officers possessed reasonable suspicion to stop and investigate Mr. Spaulding predicated on a reliable confidential informant. In addition, the government contends a sufficient nexus existed between Mr. Spaulding and the residence he was witnessed leaving immediately prior to his arrest, 949 Vernon Odum Boulevard, to substantiate the issuance of a valid search warrant. Finally, the government argues Mr. Spaulding properly received his Miranda rights and waived those rights in speaking with Officers Forney and Schmidt during a custodial interrogation at the Akron police station.

Based on the evidence adduced at the hearing and the relevant law, this Court denies the defendant's motion to suppress the physical evidence obtained at 949 Vernon Odum Boulevard and during the traffic stop pursuant to Adams v. Williams, 407 U.S. 143, 147 (1972), and Illinois v. Gates, 462 U.S. 213 (1983), and denies his motion to suppress statements he made during custodial interrogation, pursuant to Moran v. Burbine, 475 U.S. 412, 421 (1986) and Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

## I. FACTUAL BACKGROUND

On 20 July 2006, the Court conducted an evidentiary hearing on Mr. Spaulding's Motion to Suppress. At the hearing, the government elicited testimony from Akron Police Department Officers Jerry Forney, Joseph Danzy and Detective Michael Gilbride.

2

Mr. Spaulding called upon Akron Police Officer Alan Jones for testimony.  Each officer was instrumental in the investigation, arrest or questioning of Mr. Spaulding, and each officer belongs to the Street Narcotics Uniform Detail ("SNUD") Unit of the Akron Police Department.  The Court gleaned the following facts from the evidence submitted.

On 19 January 2006, members of Akron's SNUD Unit were investigating the potential drug activity of Mr. Spaulding.  According to the uncontradicted testimony of Officer Forney, a confidential informant placed a call to Mr. Spaulding for the purchase of a quarter-ounce of crack cocaine.  Officer Forney testified to having known the informant since approximately 1998, and having successfully relied upon the informant's tips on several previous occasions.  That call was made on Officer Forney's phone, in his presence, while the officer was in his squad car working to maintain surveillance on 949 Vernon Odum Boulevard, the residence in which Mr. Spaulding took the call placed by the informant.[1]  [Transcript pp. 10-13].  From this call, Officer Forney learned that a black male in his early twenties was going to leave 949 Vernon Odum Boulevard and deliver approximately a quarter-ounce of crack cocaine to a pre-determined location.  The informant conveyed to Officer Forney that the suspect would deliver the drugs within the twenty-minutes following the phone contact and would be driving a four-door Pontiac Bonneville.[2]

---

[1] In some instances of the record before the Court, 949 Vernon Odum Boulevard is referred to as 949 Wooster Avenue; they are one and the same, and the residence shall be referred to as 949 Vernon Odum Boulevard hereinafter.

[2] Testimony and records reveal the Bonneville driven by Mr. Spaulding was registered to Shauntay Jones at 672 Edgewood, in Akron, Ohio.  Testimony from Officer Forney, however, indicated, that in his experience drug trafficker's commonly drove vehicles registered to others to avoid property forfeiture actions.  (Trans. pp. 40, 74-75).

Officer Forney notified other officers in marked cars of the vehicle's license plate number and location.  Police surveillance vehicles staked out the residence during this entire episode.  Within twenty minutes of the informant's call, the individual bearing the description provided by the informant left 949 Vernon Odum Boulevard in the identified Bonneville and drove in the direction of the arranged drug buy.  Officers Danzy and Jones began tailing the Bonneville soon thereafter.  [Trans. p. 46].

Mr. Spaulding was followed for a brief period until he pulled into a private driveway.  [Trans. p. 47].  After pulling up behind Mr. Spaulding's vehicle, Officers Jones and Danzy activated their patrol car's lights and siren.  [Trans. p. 48].  Initially, Mr. Spaulding appeared to be lying down in the front seat.  Officer Danzy approached the vehicle and asked for Mr. Spaulding's operator's license.  Upon Mr. Spaulding's admission that he did not have a valid driver's license, the officer instructed the defendant to step out of the vehicle, which he did.  As Mr. Spaulding exited the Bonneville, Officer Danzy immediately noticed the smell of marijuana.  The officers placed Mr. Spaulding under arrest for "No Operator's License."  [Defendant's Exhibit B; Trans. p. 49].

This stop occurred approximately two minutes after the Bonneville left Vernon Odum Boulevard, and after it had traveled for less than a mile.  The point at which Mr. Spaulding stopped his vehicle was approximately midway between his residence at Vernon Odum and the intended destination of the drug purchase on Madison Street. [Trans. p. 50].

---

Moreover, Mr. Spaulding's lack of operator's license would have prevented him from registering a vehicle in his name.  Id.

4

In conducting a search of Mr. Spaulding's person, incident to the arrest, the officers discovered $710 in his right pants pocket. During the search, a plastic bag the defendant had concealed in his underwear fell out of his pant leg; the bag contained approximately 6 grams of crack, an amount consistent with the buy amount ordered by the confidential informant. [Trans. p. 50]. In addition, a K-9 unit arrived on the scene and alerted the officers to the vehicle wherein they found a small bag containing 3.3 grams of marijuana.

As a crowd gathered at the location of the arrest the officers moved Mr. Spaulding and his vehicle to Perkins Park, two blocks from their initial encounter with the defendant. At the park the officers indicated to Mr. Spaulding they intended to conduct a search of 949 Vernon Odum Boulevard, the residence he was observed leaving moments before his arrest. Mr. Spaulding stated that he could not consent to the search because the residence was rented to his cousin. At this time, when Officer Jones completed the Tow Report for the Bonneville and the Citation for "No Operator's License," he indicated on both forms that Mr. Spaulding's registered address was 1054 Valdes, in Akron, Ohio. (Defendant's Exhibits A & B). Detective Danzy asked Mr. Spaulding if the keys on his single key-chain would open the door to 949 Vernon Odum Boulevard, but Mr. Spaulding did not respond. During this time, Detective Carney of the Akron Police Department came to Perkins Park to assist with the paperwork and retrieve Mr. Spaulding's keys in anticipation of the search warrant for 949 Vernon Odum.  [Trans. p. 51-52].

At Perkins Park, the officers inventoried the vehicle, completed the tow report, [Defendant's Exhibit A; Trans. p. 57], and waited for the issuance of the warrant.

[Trans. p. 52].  During this period, the officers informed Mr. Spaulding of the likelihood of a warrant to search 949 Vernon Odum Boulevard and posed a question to the defendant regarding what they might expect should a warrant be carried out on the residence.  [Trans. p. 53].  According to Officer Danzy, this question was limited to asking Mr. Spaulding whether anyone was home, and whether the residence had any dogs or children who might be present during an ensuing search.  In his testimony, Officer Danzy related that these questions were usually asked prior to effecting a search warrant as a safety measure for the officers carrying out the warrant as well as for the well-being of any occupants in the dwelling. [Trans. p. 53].  Mr. Spaulding responded merely that 949 Vernon Odum Boulevard was his cousin's residence.

Mr. Spaulding was transported to the police station while Officer Gilbride prepared an affidavit in support of a search warrant.  Once at the police station, Officer Forney read Mr. Spaulding his <u>Miranda</u> rights.  [Trans. p. 35].  This was witnessed by Officer Schmidt, but was not recorded or documented.  Such procedure is customary in the Akron Police Department, according to Officer Forney's testimony.  [Trans. p. 35-38].  During the fifteen minute interrogation of the defendant, Officer Forney testified Mr. Spaulding waived his <u>Miranda</u> rights and made certain admissions involving his drug activity.  During the suppression hearing, Officer Forney discussed the Akron Police Department's policy of not recording interrogations such as Mr. Spaulding's as a means to motivate defendants to discuss the drug sale network in which they participate while maintaining anonymity.  The officer testified to the department's policy of requiring a fellow officer to witness the administration of the defendant's <u>Miranda</u> rights, which was facilitated by Officer Schmidt in the case of Mr. Spaulding.  (Trans. pp. 42-44).

6

While Mr. Spaulding was transported to the police station, Officer Gilbride prepared an affidavit (Government's Exhibit 1) for a search warrant for the home at 949 Vernon Odum Boulevard.  In his affidavit, Officer Gilbride indicates that he was aware that on "19 January 2005[sic],"[3] Officer Forney received a tip that a drug transaction would transpire.  Officer Gilbride considered the veracity of the tip as grounds for establishing good cause to believe 949 Vernon Odum Boulevard contained evidence related to drug trafficking and recounted the tip, the reliability of the tipster, and the results of Mr. Spaulding's arrest.  Officer Gilbride's affidavit did not mention, because he did not know at the time he composed the affidavit, that Mr. Spaulding's registered address was 1054 Valdes, in Akron, Ohio, that his cousin lived at 949 Vernon Odum Boulevard, and that the Bonneville was registered to Shauntay Jones at 672 Edgewood in Akron, Ohio.  Municipal Judge Alison McCarthy signed the search warrant at 8:32 p.m. on 19 January 2006, and it was executed shortly thereafter.

While Mr Spaulding was being transported to the police station and Officer Gilbride was preparing his affidavit, several officers waited outside of 949 Vernon Odum Boulevard in anticipation of the search warrant.  One of the waiting officers, Detective Carney, later reported he was approached by Sabrina Collins and her sister Celina Collins who asked what officers were doing at their house.  Detective Carney explained that a narcotics investigation was being conducted, that Mr. Spaulding was stopped after leaving the home, and that he was found with drugs on his person.  Sabrina Collins told Detective Carney she obtained the home from Mr. Spaulding who gave up the

---

[3]Officer Gilbride's affidavit should have referenced 19 January 2006.  The Court addresses this clerical error further in the Order.

7

lease and put it in her name.  According to Detective Carney, Sabrina Collins claimed to have sublet Mr. Spaulding a room in the home but claimed he was in the process of moving out.  Celina Collins allegedly advised she was renting a room in the home as well.  Both women denied ever seeing drugs on Mr. Spaulding or in the residence.

After the officers learned the search warrant was signed, officers used the keys Detective Carney took from Mr. Spaulding at Perkins Park to open the door to 949 Vernon Odum Boulevard.  There, in the room indicated by Celena Collins as belonging to Mr. Spaulding, officers found crack cocaine, firearms, and other suspected contraband.

On 7 February 2006, the government filed a three-count indictment against Mr. Spaulding for felony possession of a firearm in violation of 18 U.S.C. § 922(g)(1), and for possession of crack cocaine with the intent to distribute, in violation of 21 U.S.C. 841(a)(1), (b)(1)(B) & (b)(1)(C).  (Docket No. 1).

## II. LAW AND ANALYSIS

The Fourth Amendment states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."  U.S. Const. amend. IV.  This protection extends to the unreasonable seizure of persons, California v. Hodari D., 499 U.S. 621, 624 (1991), and "belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs," Terry v. Ohio, 392 U.S. 1, 8-9 (1968). Of course, the Fourth Amendment does not prohibit all seizures, only those that are unreasonable.  Id. at 9.

### A. The Investigatory Stop of Mr. Spaulding was Valid.

Although the proponent of a motion to suppress generally bears the burden of establishing his or her Fourth Amendment rights were violated by a challenged search or seizure, Rakas v. Illinois, 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978), it is the government's burden to demonstrate by a preponderance of the evidence that a particular seizure was based on either probable cause or reasonable suspicion.  United States v. Baldwin, 114 Fed. Appx. 675, 681 (6th Cir.2004); United States v. Winfrey, 915 F.2d 212, 216 (6th Cir.1990).  The Court finds the evidence the government has presented supports the investigatory stop of Mr. Spaulding as predicated on reasonable suspicion in accordance with Terry, and its progeny.

In Adams v. Williams, 407 U.S. 143, 147 (1972), the United States Supreme Court held that information provided by an informant, if sufficiently reliable, may constitute sufficient grounds for an investigatory stop.  The Adams Court found that information provided by an informant had a sufficient indicia of reliability to justify stopping the defendant, where the officer knew the informant and had received reliable information from the informant in the past.  As noted by the Court, "the policeman found Williams in possession of a gun in precisely the place predicted by the informant."  Id. at 148.  The Court further noted that once the officer found the gun, there was probable cause to arrest the defendant.  Id. at 148-49.

The situation presented in the instant case is similar to Adams.  The officers had reasonable suspicion to approach Mr. Spaulding in his parked car as it was en route to effect the prearranged drug sale.  That reasonable suspicion was predicated on precise details provided the SNUD and Officer Forney by a reliable information source.  In the

9

presence of Officer Forney, the source both induced Mr. Spaulding to deliver a quarter-ounce of crack cocaine and provided a precise description of the residence out of which the defendant worked, the vehicle he drove with its license plate number, and a physical description of the defendant.  That residence was placed under surveillance at the time of the call made by the confidential source, and when Mr. Spaulding soon departed in the described vehicle, headed in the direction of the previously arranged drug sale, he was followed by members of the SNUD.

The officers following Mr. Spaulding made a reasonable, educated estimation predicated on their experience that the defendant's turn into a private driveway on Mercer and Stone – en route to his destination –  was an evasive move, one designed to force the marked police car to pass.  [Trans. p. 31].  After pulling into the driveway, Mr. Spaulding also lay down in the front seat of the Bonneville, either to conceal himself or to conceal items in the car.  Under the totality of the circumstances, Officers Danzy and Jones had the reasonable suspicion necessary to approach the vehicle and pose questions of Mr. Spaulding.

Once Mr. Spaulding admitted to operating the vehicle without a license the officers had probable cause to further investigate and eventually arrest the defendant, as they did, upon charges of "No Operator's License."  As well, the detected aroma of marijuana emanating from the car provided the officers with additional grounds upon which to rest probable cause to investigate and eventually arrest the defendant.  Accordingly, the defendant's motion to suppress the evidence obtained during the initial encounter with, and arrest by, the officers, is denied.

**B.    The Viability of the Search Warrant**

Mr. Spaulding maintains the affidavit provided in support of a search warrant for 949 Vernon Odum Boulevard fails to set forth a sufficient nexus between that residence and the defendant.  (Docket No. 26, pp 8-12; Trans. pp. 90-92).  As such, Mr. Spaulding contends the officers failed to establish the necessary probable cause to support the issuance of a search warrant for 949 Vernon Odum Boulevard.[4]  Upon review of the papers before the Court, and in light of the testimony proffered at the suppression hearing, the Court finds probable cause to support the issuance of a valid search warrant for 949 Vernon Odum Boulevard.

The Fourth Amendment, which states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation," U.S. CONST. amend. IV, requires that probable cause be determined "by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out federal crime." Johnson v. United States, 333 U.S. 10, 14 (1948).  In order for a magistrate to be able to perform his or her official function, the affidavit must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant.  Whiteley v. Warden, 401 U.S. 560, 564, (1971).  Probable cause is defined as "reasonable grounds for belief, supported by less

---

[4]Mr. Spaulding's initial argument, that Detective Gilbride's misdated affidavit makes it facially stale skirts common-sense. (Def's Motion pp. 10-11).  Detective Gilbride's affidavit noted the officers received the detailed information on Mr. Spaulding's drug activities on 19 January 2005, rather than 2006.  In the context of the submission of the affidavit on the very same day as the tip, the urgent tone of the affidavit (¶ 8), the pendency of the officers' activity while they awaited the search warrant (¶ 10), and the date itself, not three weeks into the new-year, Detective Gilbride's clerical error does not undermine the validity of the application.

11

than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir.1990). It requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 244 n. 13 (1983). A warrant must be upheld as long as the magistrate had a "substantial basis for ⋯ conclud[ing] that a search would uncover evidence of wrongdoing." Id. at 236. See also United States v. Finch, 998 F.2d 349, 352 (6th Cir.1993). The supporting facts in an affidavit need not be based on direct knowledge and observations of the affiant, but may come from hearsay information supplied by an informant. Jones v. United States, 362 U.S. 257, 269-70 (1960).

In Illinois v. Gates, the United States Supreme Court established a "totality of the circumstances" test for determining whether a tip established probable cause, stating the following:

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of crime will be found in a particular place.

462 U.S. at 238. "Veracity" involves the credibility of the informant or, alternatively, the reliability of the informant's report. Id. at 229. An affidavit thus must contain a statement about some of the underlying circumstances indicating the informant was credible or that his or her information was reliable. Aguilar v. Texas, 378 U.S. 108, 114, (1964). "Basis of knowledge" refers to the particular means by which an informant obtained his or her information. Gates, 462 U.S. at 228. There must be sufficient indication of the underlying circumstances from which an informant could reasonably

12

conclude illegal activity is afoot.  Spinelli v. United States, 393 U.S. 410, 416 (1969).   In assessing an informant's "basis of knowledge," the degree of detail contained in a tip may be used to infer whether the informant had a reliable basis for making his or her statements.  Id.  An explicit and detailed description of the alleged wrongdoing allows a magistrate to "reasonably infer that the informant had gained his information in a reliable way."  Id. at 417.

As the United States Supreme Court indicated in Gates, although "veracity," "reliability," and "basis of knowledge" are highly relevant in assessing the value of an informant's tip, these elements should not be understood as "entirely separate and independent requirements to be rigidly exacted in every case."  462 U.S. at 230.  Instead, they should be regarded as "closely intertwined issues that may usefully illuminate the commonsense, practical question" of whether an informant's tip establishes probable cause.  Id. Therefore, under a "totality of the circumstances" approach, a deficiency in one of these areas "may be compensated for, in determining the overall reliability of [an informant's] tip, by a strong showing as to the other, or by some other indicia of reliability."  Id. at 233.  The Court in Gates concluded "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ⋯ conclud [ing]' that probable cause existed."  Id. at 238-39.  The Court must ensure that the magistrate was informed of some of the underlying circumstances from which the informant concluded evidence of a crime is where he or she claimed it would be found, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, was reliable.  Aguilar, 378 U.S. at 114.

The affidavit before the Court, presented in anticipation of a search warrant for 949 Vernon Odum Boulevard, exhibits the signatures of "veracity," "basis of knowledge" and "reliability," called for in Gates. Detective Gilbride provided Judge Alison McCarty with the relevant information linking Mr. Spaulding to the residence at 949 Vernon Odum Boulevard. The residence was placed under surveillance during the time in which the confidential source arranged for a drug buy from Mr. Spaulding within the twenty-minutes following the phone conversation. Within that time period, Mr. Spaulding was witnessed leaving the residence and driving the vehicle identified by the informant in the direction of the prearranged drug buy. The information provided by the informant was corroborated by the surveillance officers, and that corroboration was conveyed in the affidavit. Moreover, the affidavit notes the specifics of the investigatory stop which ensued, the cash and drugs found on the defendant's person, as well as the house keys to 949 Vernon Odum Boulevard, which were on the same ring as Mr. Spaulding's car keys. The affidavit also conveys that Mr. Spaulding, while in possession of those house keys, "denied living at the residence."[5] (¶ 3).

---

[5] During the suppression hearing, Mr. Spaulding provided evidence, both from the Tow Report (Defendant's Exhibit A) and the Citation (Defendant's Exhibit B) he received for driving without a license, that his registered residence was 1054 Valdez rather than at 949 Vernon Odum. For purposes of the viability of the search warrant, this distinction does not amount to a legally cognizable difference for the following reasons. First, the affiant clearly noted that Mr. Spaulding "denied living at 949 Vernon Odum." (¶ 3). Second, Officer Danzy provided a compelling argument during his testimony that, in his years of experience in the Akron narcotics unit, it was commonplace for drug dealers to differentiate between where they lived and where they stayed, housing their drug resources where they stayed as separate from where they lived, so as to provide a safe haven for the latter. (Transcript pp. 63-65). Accordingly, that Mr. Spaulding had a registered address different from 949 Vernon Odum Boulevard does little to mitigate the clear evidence of his connection to the residence officers sought a warrant to search after the defendant facilitated a drug deal at the residence, was witnessed leaving the

Further, the affidavit conveys the veracity of the confidential source, noting previous tips provided to Officer Forney, as well as the confidential source's specific knowledge of drug distribution in the Akron area.  Probable cause generally exists to search for the "fruits and instrumentalities of criminal activity" at the residence of a drug dealer.  U.S. v. Newton, 389 F.3d 631, 636 (6th Cir.2004).  Accordingly, the search warrant properly issued on the basis of probable cause as the evidence clearly establishes a nexus between Mr. Spaulding, his drug transactions, and the residence at 949 Vernon Odum Boulevard.  The Court upholds the validity of the warrant and denies the defendant's motion to suppress the evidence garnered during the execution of that warrant.

### C. The Voluntariness of Mr. Spaulding's Statements

Mr. Spaulding maintains he was not properly Mirandized when he was questioned at Perkins Park and contends his incriminating admissions, made at the police station, should be suppressed because the officers failed to properly record or preserve the reading of his Miranda rights or his waiver of those rights.  (Docket No. 26, pp. 12-18; Trans. pp. 89-90).

Custodial interrogations are coercive by nature; therefore, Miranda rights are necessary to protect Fifth and Sixth amendment rights.  The United States Supreme Court articulated the standard established by Miranda and its progeny:

> Miranda holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently."  The inquiry has two distinct dimensions.

---

residence to affect the drug transaction and carried the house key on his key ring when officers arrested him.  (Trans. p. 33).

15

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (citations omitted). The government bears the burden of proving the defendant "voluntarily, knowingly, and intelligently waived his rights to silence and counsel." United States v. Bentley, 726 F.2d 1124, 1128 (6th Cir. 1984). "Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our Miranda doctrine, the State need prove waiver only by a preponderance of the evidence." Colorado v. Connelly, 479 U.S. 157, 169 (1986). This means the government must establish that it was more likely than not that a defendant was read his Miranda rights and acknowledged that he had a right to remain silent. "Any statement given freely and voluntarily without any compelling influences is . . . admissible evidence." Miranda, 384 U.S. at 478.

As the United States Supreme Court has observed, "courts look to the totality of the circumstances to determine whether a confession is voluntary." Withrow v. Williams, 507 U.S. 680, 693 (1993). In that regard, the Withrow Court found that relevant circumstances include: (1) police coercion; (2) duration of the interrogation; (3) location of the interrogation; (4) the defendant's maturity; (5) the defendant's educational background; (6) the defendant's physical condition and mental health; (7) and whether the defendant was informed of his or her Miranda rights. Id.

16

The decision in Miranda also instructs the Court to recognize that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. 384 U.S. at 444.  The interrogation of a suspect in custody who has not received the Miranda warnings is "presumed compelled." Oregon v. Elstad, 470 U.S. 298, 317 (1985).  In Miranda, the Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444.

In the instant matter, Mr. Spaulding was clearly in custody and had not received his Miranda warnings when Officer Danzy questioned him at Perkins Park.  Officer Danzy testified that while he and his partner waited the twenty minutes it took to secure the search warrant he informed Mr. Spaulding they were applying for such a warrant to search 949 Vernon Odum Boulevard.  Officer Danzy then asked whether anyone would currently be in the residence.  (Transcript pp. 53-55).  Officer Danzy confirmed the practice of eliciting this information as compelled by concerns over officer and resident safety prior to executing a search warrant.  According to Officer Danzy, Mr. Spaulding responded that he did not live at 949 Vernon Odum, that it was his cousin's residence.  (Trans. p. 55).

This Court does not consider Officer's Danzy's question an unconstitutional interrogation of Mr. Spaulding.  The Supreme Court directs this Court to consider interrogation broadly as "express questioning and its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  More precisely, interrogation in contravention

of the Miranda safeguards refers "to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id.; see also Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (explaining the necessity for courts to assess from the defendant's perspective the reasonable likelihood of eliciting an incriminating response); United States v. Avery, 717 F.2d 1020, 1025 (6th Cir. 1983). In the context of this case, where the defendant knew he had been seen leaving 949 Vernon Odum, Officer Danzy's question could not elicit an incriminating response because Mr. Spaulding did not deny being at the residence, insisting instead only that he did not live there. Whether he could have known if others were in the house could not, therefore, have proven incriminating.

Officer Forney testified that after the defendant was brought to the police station he advised Mr. Spaulding of his Miranda rights, to which Officer Schmidt bore witness. Counsel for both the government and the defendant elicited testimony from Officer Forney which established reasonable grounds for the Akron Police Department's standard practice of not recording interrogations. (Transcript pp. 34-44). The Court finds the officer's account highly credible. Accordingly, that Mr. Spaulding was advised of his Miranda rights, with another officer witnessing the administration of those rights, establishes the defendant was properly Mirandized. The credible testimony from Officer Forney also establishes the incriminating admissions made by Mr. Spaulding during the interrogation were made voluntarily, knowingly and intelligently, thus effectively waiving his Miranda rights.

In reviewing the Withrow considerations, it is clear from the testimony that the interrogation, in an interrogation room of the sixth-floor of the Akron Police Station, was not coercive and quite brief, extending no more than fifteen minutes.  The testimony and the record both indicate that Mr. Spaulding, twenty-one years of age at the time of his arrest, had several previous arrests for drug possession and distribution; in short, he was mature, familiar with police enforcement procedures, and conveyed no sign of being under the influence of drugs or alcohol at the time of his interrogation.

Pursuant to the standards etched out in Innis, the Court does not construe Officer Danzy's question an improper interrogation of Mr. Spaulding.  Pursuant to Burbine, Mr. Spaulding properly received his Miranda rights prior to his custodial interrogation and waived them in offering an incriminating admission.  Accordingly, Mr. Spaulding's admission shall not be suppressed as having been compelled.

### **III. CONCLUSION**

For the reasons discussed above, defendant's motion to suppress his statements and the evidence recovered from his person, vehicle and residence is denied.

IT IS SO ORDERED.

    /s/Lesley Wells
UNITED STATES DISTRICT JUDGE

Dated: 23 August 2006